## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

—————————————————————————
                        )
DEFENDERS OF WILDLIFE and HEALTHY    )
GULF;                               )
                        )
           Plaintiffs,              )
                        )
          v.                     )     Case No. 1:20-cv-142-LG-RHW
                        )
UNITED STATES ARMY CORPS OF        )
ENGINEERS and MISSISSIPPI RIVER       )
COMMISSION;                      )
                        )
          Defendants.            )
—————————————————————————)

## COMPLAINT

1.      This case challenges the U.S. Army Corps of Engineers' ("Corps") and Mississippi River Commission's ("MRC") ongoing failure to comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, in operating the Bonnet Carré Spillway ("Spillway"), a flood-control mechanism on the lower Mississippi River situated approximately 33 river miles upstream of New Orleans.

2.      The Spillway is designed to reduce flood risk in New Orleans by diverting a massive amount of river water from the Mississippi River into the Lake Pontchartrain Basin and eventually into the Mississippi Sound. The river water carries a heavy pollutant load, causes salinity levels to crash, and is colder than the warm waters in the receiving lakes and sound, causing an array of impacts that adversely affect wildlife and destroy habitat. In 2019 alone, when the Spillway was opened twice for a total of four months, oyster beds were destroyed, commercial fishery operations devastated, and hundreds of dolphins died and washed ashore potentially as a result of the decreased salinity in the Mississippi Sound. Indeed, in September

2019, the U.S. Department of Commerce declared a fisheries disaster as a result of the damage done to commercial fisheries and at the request of the governors of Mississippi, Louisiana, and Alabama.

3.     Yet neither the Corps nor MRC have acknowledged or evaluated the many potential impacts of these diversions on nine threatened and endangered species that inhabit and migrate through the Lake Pontchartrain Basin and Mississippi Sound. This failure violates the ESA. Specifically, the agencies have never completed a formal or informal ESA consultation with the U.S. Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS") (collectively, the "Services") for five sea turtle species (Kemp's ridley, loggerhead, green, leatherback, and hawksbill), piping plover, red knot, West Indian manatee, and Gulf subspecies of Atlantic sturgeon ("Gulf sturgeon"), or for designated critical habitat for the loggerhead sea turtle, Gulf sturgeon, and piping plover.

4.     The purpose of this consultation is to evaluate the impacts of Spillway operations and modify those operations as needed to protect imperiled species and critical habitat. Because the Corps and MRC have failed to complete the mandatory section 7(a)(2) consultation regarding these species and critical habitats, the agencies have also unlawfully failed to ensure that federal operation of the Spillway is not likely to jeopardize listed species or destroy or adversely modify designated critical habitat as required by ESA section 7(a)(2).

5.     The urgency to remedy these failures has never been greater. The Corps estimates it opens the Spillway approximately every ten years. But the agencies have now opened the Spillway six times in the last nine years. In fact, the agencies recently opened the Spillway for the third year in a row, on April 3, 2020 and it remains open now. As more extreme storms and varied weather increase the number and intensity of floods in the lower Mississippi River valley

region, it is likely that the Spillway will be opened more frequently and for increasingly longer duration in the future. This in turn will increase the frequency and duration that imperiled species and habitats are subjected to Spillway water pollutants and other impacts.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), which waives Defendants' sovereign immunity. As required by 16 U.S.C. § 1540(g)(2)(A), Plaintiffs provided Defendants with written notice of their ESA violations and Plaintiffs' intent to sue more than sixty days before the commencement of this action. During the sixty-day notice period, Defendants did not cure their violations of law.

7.      This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) and (g) (action arising under the ESA and citizen suit provision), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1346(a)(2) (United States as defendant), and may issue a declaratory judgment and other requested relief pursuant to 16 U.S.C. § 1540(g)(1)(A) (ESA) and 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act). An actual controversy within the meaning of the Declaratory Judgment Act exists between Plaintiffs and Defendants.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

9.      Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a non-profit, membership organization headquartered in Washington, D.C. with field offices throughout the country. Founded in 1947, Defenders is a science-based conservation organization with more than 347,000 members nationwide, including more than 2,300 members in Louisiana and 1,450 members in Mississippi. Many of Defenders' members reside, work and recreate within the area

affected by operation of the Spillway, including the Lake Pontchartrain Basin and Mississippi Sound. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend. Defenders advocates new approaches to wildlife conservation that will help keep species from becoming endangered, and it employs education, litigation, research, legislation and advocacy to defend wildlife and their habitat. Defenders is one of the nation's leading advocates for endangered species conservation and has been involved in issues of ESA implementation since the statute was passed in 1973. Defenders brings this action on its own institutional behalf and on behalf of its members.

10.     Plaintiff HEALTHY GULF (formerly Gulf Restoration Network) is a non-profit, membership organization headquartered in New Orleans, Louisiana. Since 1998, Healthy Gulf has worked to reduce pollution in Gulf waterways and preserve Gulf wetlands, and advocated for sustainable management of Gulf fisheries and protection of native threatened and endangered species. Healthy Gulf and its more than 500 members, including over 350 in Louisiana and Mississippi, are dedicated to protecting and restoring the natural resources of the Gulf Region. Many of Healthy Gulf's members reside, work and recreate within the area affected by operation of the Spillway, including the Lake Pontchartrain Basin and Mississippi Sound. Healthy Gulf seeks to preserve the Gulf of Mexico's natural, economic and recreational resources central to the culture and heritage of five states and several nations, and strives to empower the people of this region to become stewards of this vital but imperiled treasure and assume the responsibility of returning the Gulf to its former splendor. Healthy Gulf brings this action on its own institutional behalf and on behalf of its members.

11.     Plaintiffs' members have scientific, aesthetic, recreational, conservation,

4

economic, educational, spiritual, and other interests in the ecosystems, wildlife, and habitat of the Lake Pontchartrain Basin and Mississippi Sound. Plaintiffs' members and staff live and work in and/or recreate throughout the Lake Pontchartrain Basin and Mississippi Sound. Plaintiffs' members have spent numerous hours recreating throughout and otherwise enjoying these areas in the past and have concrete plans to continue to do so in the future. These recreational activities include fishing, boating, photography, swimming, birdwatching, wildlife viewing, beachgoing, and other activities. Some members operate small businesses in these areas and have an economic interest in the ecosystems, habitats, and wildlife of the Lake Pontchartrain Basin and Mississippi Sound. For example, the commercial success of their businesses, which include birdwatching, wildlife tours, and ferryboat rides, relies on attracting customers who seek to observe rare wildlife in natural habitats. Plaintiffs' members and staff have concrete future plans to continue pursuing all of the above activities in the Lake Pontchartrain Basin and Mississippi Sound. Plaintiffs' interests in continuing to pursue all the above activities are dependent on the continued existence of a healthy ecosystem supporting native wildlife populations in the wild.

12.     The legal violations alleged in this Complaint cause direct injury to the scientific, aesthetic, recreational, economic, conservation, educational, spiritual, and other interests of Plaintiffs and their members and staff. These are actual, concrete injuries to Plaintiffs, caused by Defendants' failure to comply with the ESA and its implementing regulations. Unless the requested relief is granted, Plaintiffs' interests will continue to be injured by Defendants' failure to comply with the ESA. The relief sought herein would redress Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law.

13.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS is a federal agency within the Department of Defense. The Corps is responsible for the day-to-day operation

of the Spillway, and for advising the MRC regarding when to open the Spillway and other elements of the Mississippi River and Tributaries Project.

14.     Defendant MISSISSIPPI RIVER COMMISSION is a federal agency established by statute. The MRC is responsible for authorizing the opening of the Bonnet Carré Spillway.

## STATUTORY AND REGULATORY FRAMEWORK

### A.  The Endangered Species Act

15.      The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). It was enacted "to provide a program for the conservation of . . . endangered species and threatened species" and "to provide a means by which the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

16.     The Ninth Circuit has described section 7(a)(2) as the "heart of the ESA." Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1019 (9th Cir. 2012) (quoting W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 495 (9th Cir. 2011)). Section 7(a)(2) mandates that all federal agencies "insure that any action authorized, funded, or carried out by [the agency] . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). See also 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of" and "destruction or adverse modification").

17.     To carry out this substantive mandate, all federal agencies are required to consult with the appropriate federal wildlife agency—the U.S. Fish and Wildlife Service and/or the National Marine Fisheries Service—on any agency "action" that "may affect" listed species or designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). See Medina Cty.

Envtl. Action Ass'n v. Surface Transp. Bd., 602 F.3d 687, 693 (5th Cir. 2010); W. Watersheds, 632 F.3d at 495.

18.     An agency "action" is defined broadly and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. The action must also involve "discretionary Federal involvement or control." Id. § 402.03.

19.     The "may affect" threshold, in turn, is "relatively low." Karuk Tribe, 681 F.3d at 1027 (quoting Cal. ex rel. Lockyer v. U.S. Dep't of Agric., 575 F.3d 999, 1018 (9th Cir. 2009)). "Any possible effect, whether beneficial, benign, adverse or of an undetermined character" triggers the consultation requirement. Id. (quoting Lockyer, 575 F.3d at 1018–19; 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)) (emphasis omitted). "An agency may avoid the consultation requirement only if its action will have 'no effect' on a listed species or critical habitat." Karuk Tribe, 681 F.3d at 1027 (citing Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1447–48 (9th Cir. 1996)).

20.     The action agency must consider listed species and critical habitat within the entire "action area," which is defined to include "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. "Effects of the action" are defined as "all consequences to listed species or critical habitat that are caused by the proposed action" and include impacts that "may occur later in time" or "outside the immediate area involved in the action." Id.

21.     To begin the consultation process, the federal agency must contact the appropriate wildlife agency to determine if listed species or critical habitat "may be present" in the area affected by the proposed action. 16 U.S.C. § 1536(c)(1); Medina Cty., 602 F.3d at 693; Forest

Guardians v. Johanns, 450 F.3d 455, 457 (9th Cir. 2006). If so, the action agency must prepare a biological assessment. Medina Cty., 450 F.3d at 694; Forest Guardians, 450 F.3d at 457. If the action agency determines in the biological assessment that the proposed action is "not likely to adversely affect any listed species or critical habitat," 50 C.F.R. § 402.14(b)(1), and FWS or NMFS (as appropriate) issues a written concurrence with that finding, formal consultation is not required and the consultation process is complete. Id. §§ 402.12(j), (k). Alternatively, if FWS or NMFS determines during informal consultation that the proposed action is "likely to adversely affect" any listed species or critical habitat, formal consultation is required. See id. § 402.13(c); see also id. § 402.12(a).

22.     At the end of the formal consultation process, FWS or NMFS issues a biological opinion in which the agency assesses whether the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify any designated critical habitat. Id. § 402.14(h). If so, the wildlife agency identifies "reasonable and prudent alternatives" that avoid this violation. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(g), (h).

23.     Although "emergency" consultations are not mentioned in the statute, ESA regulations also set out procedures for consultation in "emergency circumstances." 50 C.F.R. § 402.05. These regulations explain that "expedited consultation" may be used "[w]here emergency circumstances mandate the need to consult in an expedited manner" such as in "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." Id. § 402.05(a). In such emergency circumstances, expedited consultation "may be conducted informally through alternative procedures" so long as those procedures are "consistent with the requirements of section 7(a)–(d) of the [ESA]." Id. Once the emergency is "under control," the agency must initiate formal consultation "as soon as practicable." Id. § 402.05(b).

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

### A. The Mississippi River & Tributaries Project and the Bonnet Carré Spillway

24.     The Mississippi River is the second longest river in North America. It drains an area of approximately 1.2 million square miles that includes all or part of 31 states and parts of Canada. If left alone, the Mississippi would follow a meandering and ever-changing course and frequently flood its banks.

25.     In the mid-1800s, the European settlers in the Mississippi River Basin began in earnest to try to control the path of the river and reduce its flooding capacity. In 1879, the federal government created the Mississippi River Commission. 33 U.S.C. §§ 641 et seq. The MRC is comprised of seven members: three U.S. Army Corps of Engineers officers, one member of the National Oceanic and Atmospheric Administration's ("NOAA") National Ocean Survey (formerly the U.S. Coast and Geodetic Survey), and three civilians, two of whom must be civil engineers. Each member of the MRC is nominated and appointed by the President of the United States. The commanding officer of the Mississippi Valley Division of the U.S. Army Corps of Engineers serves as the MRC President.

26.     The MRC was charged with developing plans to prevent flooding, improve navigation, and promote commerce and trade. Id. § 647. Over the next several decades, the MRC prioritized building and strengthening levees to prevent catastrophic floods. This approach was in place until the Great Flood of 1927, which breached and overtopped numerous levees, causing widespread property damage and loss of life.

27.     In response to the 1927 flood, Congress passed the Flood Control Act of 1928. 33 U.S.C. §§ 702a–702o. The Flood Control Act authorized construction of the Mississippi River and Tributaries Project. The Mississippi River and Tributaries Project is a comprehensive project

featuring numerous flood control elements up and down the Mississippi River. These elements include levee improvements, channel improvements, and control structures or spillways designed to divert water out of the main channel.

28.     The Mississippi River and Tributaries Project was intended to protect the communities in the Mississippi River Basin from a "Project Flood," defined as a hypothetical flood greater than the 1927 flood. The project was set forth in a series of recommendations in House Report No. 90 of the 70th Congress, a document commonly called the "Jadwin Report." The Jadwin Report also recommended that the Corps exercise its discretion to modify the specific projects outlined in the report as needed.

29.     The Jadwin Report recommended, and the Flood Control Act authorized, the construction of the Bonnet Carré Spillway in the lower Mississippi River Basin. The Spillway was intended as a relief valve for the river to reduce the risk of flooding in New Orleans. The Jadwin Report recommended utilizing the Spillway to limit the mainstem river flows to 1.25 million cubic feet per second ("cfs") at New Orleans. Under the river conditions at the time the report was prepared in 1927, this flow rate was equivalent to a maximum of 20 feet at the Carrollton Gauge near the city.

30.     The Spillway is comprised of a control structure on the east side of the Mississippi River and a 5.7-mile floodway that flows into Lake Pontchartrain and eventually the Mississippi Sound. By opening the control structure, up to 250,000 cfs of floodwater can be diverted from the Mississippi River. This represents approximately half of the river's average flow. The control structure and floodway are collectively referred to as the Spillway.

31.     The Spillway control structure holds 7,000 wooden timbers within 350 bays. To open the Spillway, the Corps operates two cranes moving on rails along the top of the control

structure to lift out individual timbers. The Corps may choose to remove some or all of the timbers, thereby controlling the size of the opening and the volume and duration of the diverted flow. To close the Spillway, the Corps gradually reinserts the timbers; this sequence is also variable in duration. Even when the Spillway is closed, the river can rise above the concrete control structure and spill into the floodway.

32.     After the Bonnet Carré Spillway was constructed, subsequent amendments to the Flood Control Act authorized additional control structures that have been constructed upstream of the Bonnet Carré Spillway. The Morganza Floodway was authorized in the 1936 Flood Control Act. It is located approximately 50 river miles upstream of Baton Rouge. The floodway can divert up to 600,000 cfs out of the Mississippi River and into the Atchafalaya River. The Old River Control Structure is located approximately 35 river miles north of the Morganza Floodway. That structure is designed to prevent the main channel of the Mississippi River from flowing into the Atchafalaya. It can also be used for flood control. The structure can divert up to 620,000 cfs from the Mississippi River. Both the Morganza and Old River structures can be utilized to reduce the amount of water flowing down the main channel toward New Orleans before the water reaches the Bonnet Carré Spillway.

33.     The President of the MRC has decision-making authority over when to open the Bonnet Carré Spillway. The Corps is responsible for making recommendations to the President and for the day-to-day operation of the Spillway.

34.     The Corps retains discretion to identify and implement operational changes for the Bonnet Carré Spillway that may mitigate impacts on threatened and endangered species. These changes may include adjusting the timing and duration of the flow into Lake Pontchartrain, utilizing the Morganza and Old River Control structures to divert more water from

the main channel before it reaches the Bonnet Carré Spillway, and other means of mitigating impacts.

35.     The Corps' and MRC's operation of the Bonnet Carré Spillway is guided by a series of documents issued by the Corps. One such document is a "Water Control Manual" most recently revised in 1999. The Corps issued the Manual in part to "aid the water control decision-making process." The Manual states that the agency takes steps to mitigate impacts on fish and wildlife and other resources, and that it gathers information on Spillway operations' impacts on these resources. The Manual does not address mitigation measures for the nine threatened and endangered species discussed here.

36.     The precipitation and flood patterns in the Mississippi River Basin have changed over the last several decades. The frequency in which the Spillway is opened and the duration of such openings have also increased. For the first 77 years of its existence, the Corps and MRC opened the Spillway on average approximately once every ten years. In the last nine years, the agencies have opened the Spillway six times, including twice in 2019. The Spillway was opened again on April 3, 2020 and is currently open.

37.     Including the current opening, the Corps and MRC's most recent openings have occurred during the following times:

        a.      May 9, 2011 to June 20, 2011 (43 days);

        b.      January 10, 2016 to February 1, 2016 (22 days);

        c.      March 8, 2018 to March 30, 2018 (23 days);

        d.      February 27, 2019 to April 11, 2019 (44 days);

        e.      May 10, 2019 to July 27, 2019 (79 days); and

        f.      April 3, 2020 to present (12 days and counting).

38.     The 2019 openings marked the first time the agencies opened the Spillway twice in one calendar year. Prior to 2018, the agencies had never opened the Spillway in consecutive years. As more extreme storms and varied weather increase the number and intensity of floods in the lower Mississippi River valley region, it is likely that the federal agencies will continue to open the Spillway more frequently and for increasingly longer duration.

**B.   The Action Area Affected by the Spillway**

39.     The Spillway diverts Mississippi River water into the Lake Pontchartrain Basin, which flows into the Mississippi Sound. Accordingly, the Action Area affected by each Spillway opening includes, at a minimum, the Lake Pontchartrain Basin and Mississippi Sound. See map, below.



40.     The influx of river water into the basin and sound triggers a cascade of environmental impacts.

41.     For example, the fresh river water causes salinity levels in the Action Area to crash. The drop in salinity levels can kill or adversely affect myriad species dependent on particular salinity regimes.

42.     The river water is also heavily laden with pollutants from agricultural runoff and other sources. These pollutants adversely impact the Action Area. For example, excessive levels of nutrients (called eutrophication), such as from nitrogen-rich fertilizers, can trigger an overgrowth of algae. This overgrowth, called an algal bloom, consumes oxygen and blocks sunlight from underwater plants, resulting in a dead zone. Without sufficient oxygen, fish and other aquatic species are driven from their habitats or suffocate to death.

43.     Similarly, pollution caused by pesticide runoff upstream can adversely impact aquatic species in the Action Area. Acute exposure to pesticides can cause immediate mortality, whereas long-term exposures can cause abnormalities or mutations in developing fish larvae and other juvenile organisms.

44.     In addition, the river water is colder than that in the Lake Pontchartrain Basin and Mississippi Sound. This change in temperature disturbs and sometimes displaces temperature-sensitive plant and animal species which inhabit the Action Area. Immobile aquatic species can be killed by the shock of cold river water diverted through the Spillway.

45.     Moreover, the Mississippi River carries a large sediment load which, when diverted into the Action Area, creates a massive plume of sediment that affects species dependent on clear water. The river water's higher level of turbidity can also impact natural sedimentation rates, moving silty deposits into different locations and reducing deposition in

others.

46.     The impacts of opening the Spillway are exacerbated by the fact that the fresh water is slow to mix with the warmer, brackish waters in the Lake Pontchartrain Basin and Mississippi Sound. As a result, the cold, polluted, sediment-laden river water does not dilute quickly but, rather, stays concentrated in a plume.

47.     The effects of these changes on fish and wildlife species in the Action Area are not fully understood because they have not been comprehensively studied. But what is known demonstrates that the effects are significant. For example, a Louisiana Department of Wildlife and Fisheries study indicated that mortality rates on oyster reefs during the second 2019 Spillway opening were as high as 100 percent in certain locations. Similarly, as of May 2019, the state of Mississippi estimated that it was experiencing a 70 percent oyster mortality rate and a 35 percent blue crab loss. Indeed, in September 2019, in recognition of these and other catastrophic impacts to commercial fisheries caused by the Bonnet Carré Spillway openings, the U.S. Department of Commerce declared a federal fishery disaster for Mississippi, Louisiana, and Alabama.

48.     Bottlenose dolphins also suffered a much higher than normal mortality rate in 2019 in the northern Gulf of Mexico. NMFS (also known as "NOAA Fisheries") documented 260 confirmed strandings of bottlenose dolphins from February to May 2019; the historical average for the area is 87. The numbers were so alarming that NMFS declared an "Unusual Mortality Event" for the area including Louisiana, Mississippi, Alabama, and the Florida panhandle. As part of the ensuing investigation, NMFS will evaluate the role the opening of the Spillway played in the dolphins' deaths.

49.     Despite the recognition that Spillway operations have significant effects on commercial fisheries and potentially have significant effects on dolphins, the Corps and MRC

have not evaluated the scope or intensity of the likely effects on nine of the eleven threatened and endangered species in the Lake Pontchartrain Basin or Mississippi Sound.

**C. Endangered and Threatened Species Affected by the Spillway**

50.     Eleven species federally protected under the ESA are present within the Action Area:

   a.     endangered Kemp's ridley sea turtle (*Lepidochelys kempii*);

   b.     threatened loggerhead sea turtle (*Caretta caretta*);

   c.     threatened green sea turtle (*Chelonia mydas*);

   d.     endangered leatherback sea turtle (*Dermochelys coriacea*);

   e.     endangered hawksbill sea turtle (*Eretmochelys imbricata*);

   f.     threatened piping plover (*Charadrius melodus*);

   g.     threatened red knot (*Calidris canutus rufa*);

   h.     threatened Gulf subspecies of Atlantic sturgeon (*Acipenser oxyrinchus desotoi*);

   i.     threatened West Indian manatee (*Trichechus manatus*); and

   j.     endangered pallid sturgeon (*Scaphirhynchus albus*); and

   k.     shovelnose sturgeon (*Scaphirhynchus platorynchus*) (threatened status under the ESA's "similarity of appearance" provision).

51.     FWS and NMFS share jurisdiction over the sea turtles and Gulf sturgeon. FWS has sole jurisdiction over the remaining five species.

52.     The Corps and MRC have initiated ESA consultations on only two of these species: the pallid sturgeon and shovelnose sturgeon. For the remaining nine species, the Corps and FWS have never completed ESA consultations. Each of these species meet the "may affect"

standard triggering consultation obligations. Each of these species "may be present" in the Action Area, which requires consideration of the impacts in a biological assessment. In addition, each of the species are affected by changes in their environment that are also associated with the changes caused by Spillway operations, including salinity decreases, pollution, cold temperatures, increased sediment, and others.

### a. **Kemp's Ridley Sea Turtle**

53.    The Kemp's ridley sea turtle, the smallest and rarest of the sea turtle species, was listed as endangered throughout its range in 1970. 35 Fed. Reg, 18,319 (Dec. 1, 1970). This species came close to extinction in the 1980s due to historic overexploitation from egg harvesting and accidental bycatch mortality in fishing gear.

54.    Kemp's ridley turtles have powerful jaws which they use to crush and grind crabs, clams, mussels, and shrimp. They also consume fish, sea urchins, squid, jellyfish and occasionally seaweed and algae. This species prefers shallow marine habitats with sandy and muddy bottoms.

55.    Kemp's ridley sea turtles are present in the Action Area. Kemp's ridley sea turtles use the coastal waters of Louisiana for foraging grounds and are found in the Mississippi Sound. Kemp's ridleys are the most common species of marine turtle captured in the Action Area.

56.    The Corps and MRC's operation of the Spillway may affect and is likely to adversely affect Kemp's ridley sea turtles in several ways. For example, polluted water in the Kemp's ridley's marine habitat can have significant impacts on these sea turtles and their prey. Pesticides and other pollution can directly affect Kemp's ridleys. Pollution also stresses some of their prey species, particularly mollusks and crabs. Similarly, harmful algal blooms can degrade the turtle's sea grass habitat. Spillway operations may cause these and other adverse effects.

17

### b. **Loggerhead Sea Turtle and its Designated Critical Habitat**

57.     Loggerhead sea turtles were first protected under the ESA in 1978. 43 Fed. Reg.

32,800 (July 28, 1978). Loggerheads are so named for their large heads. Loggerheads are

primarily carnivorous, with adult species preying mainly on benthic crabs and mollusks, and

occasionally eating jellyfish and sea grass. Loggerheads prefer to inhabit coastal marine

environments, and are threatened by incidental capture in commercial fishing operations (e.g.,

trawling, driftnet, longline) and loss of nesting beach habitat caused by coastal development.

58.     Loggerhead sea turtles and their critical habitat are present in the Action Area.

Loggerheads inhabit coastal waters and shoreline beaches of the Gulf of Mexico from Franklin

County, Florida, west through Texas. Loggerheads also occasionally visit Lake Pontchartrain

during their migrations in shallow coastal waters across the eastern Gulf of Mexico.

59.     In 2014, NMFS and FWS designated certain beaches in eastern Mississippi and

waters off the coast of Louisiana as loggerhead critical habitat. See 79 Fed. Reg. 39,856, 39,86–

92 (July 10, 2014) (NMFS designation of marine critical habitat for the Northwest Atlantic

Ocean Loggerhead Distinct Population Segment); 79 Fed. Reg. 39,756, 39,800–01 (July 10,

2014) (FWS designation of terrestrial critical habitat for the Northwest Atlantic Ocean

Loggerhead Distinct Population Segment).

60.     In designating terrestrial critical habitat for the loggerhead in July of 2014, FWS

explained that "[a]ll terrestrial units designated as critical habitat are currently occupied by the

loggerhead sea turtle." 79 Fed. Reg. at 39,779. FWS also acknowledged that "all units" of

terrestrial designated critical habitat, including areas designated on Mississippi Sound barrier

islands "were occupied at the time of listing and are currently occupied." Id. at 39,785.

61.     The Corps' and MRC's operation of the Spillway may affect and is likely to

adversely affect the loggerhead and its critical habitat in several ways. For example, scientific studies have linked water contamination from pesticides and other pollution to altered immune systems and production of smaller eggs in loggerhead sea turtles. Additionally, persistent organic pollutants (which do not break down or degrade naturally) bioaccumulate in the bodies of individual loggerheads when they eat prey that have ingested contaminants.

62.     Eutrophication and resulting harmful algal blooms can also adversely affect loggerhead by creating dead zones, which can kill mollusks and crabs, adult loggerheads' primary prey. Additionally, harmful algal blooms produce natural toxins that can become concentrated in tissues of filter feeders, such as shellfish and other mollusks, which then bioaccumulate in loggerhead individuals when they consume those prey species.

63.     Large discharges of fresh water to marine environments (most commonly associated with extreme weather events) result in increased strandings[1] for sea turtle species, including loggerhead, green, leatherback, and hawksbill, for seven months to a year after the freshwater discharge event.

64.     Spillway operations may cause the impacts listed above and other adverse effects.

65.     In the recovery plan for the loggerhead sea turtle, NMFS and FWS recognized the potential adverse impact of reduced salinity on loggerhead prey distribution and abundance. The agencies also noted in the recovery plan that algal blooms can also adversely affect loggerhead prey, such as fish and crabs. Furthermore, the plan's Recovery Action Narrative lists assessing the impact of salinity, nutrient loading, and turbidity on loggerhead foraging habits as an "action[] necessary to achieve full recovery of the species."

---

[1] Sea turtle "strandings" include sick, injured, entangled, incapacitated, or dead marine turtles washed ashore or, in rare cases, encountered at sea.

### c. **Green Sea Turtle**

66.     Green sea turtle populations were decimated by commercial harvesting in the 1800s. The species received protection under the ESA in 1978, with populations in Florida and on the Pacific coast of Mexico listed as endangered and all other areas listed as threatened. 35 Fed. Reg, 18,319 (Dec. 1, 1970).

67.     Green sea turtles are so named because of the green tint to their flesh, caused by their herbivorous diet almost wholly comprised of sea grass and algae. While adult green sea turtles are herbivores, juveniles are omnivores that also consume insects, crustaceans and worms. Adult green turtles usually spend a majority of their time foraging in habitats comprised of benthic sea grass beds and/or algae meadows.

68.     Green sea turtles are present in the Action Area. They are found along the Mississippi coast. Scientists have documented observations of juvenile green turtles foraging and migrating through inshore and nearshore waters of the Mississippi Sound throughout the year.

69.     The Corps' and MRC's operation of the Spillway may affect and is likely to adversely affect green sea turtles in several ways. For example, sea grass is adversely affected by eutrophication-caused algal blooms. Algal blooms can block the penetration of sunlight through the marine environment and degrade the quality and essential functions of sea grass meadows by hindering photosynthesis. Nearshore sea grass meadows in the Mississippi and Chandeleur Sounds provide benthic foraging habitat for green sea turtles.

70.     In addition, green sea turtles exposed to high levels of nitrogen from agricultural runoff suffer from increased rates of fibropapilloma virus, a condition characterized by development of internal and external tumors that ultimately can lead to death. Spillway operations may cause these and other adverse effects.

20

### d. **Leatherback Sea Turtle**

71.     The leatherback sea turtle was listed as endangered throughout its range under the ESA in 1970. 35 Fed. Reg. 8,491 (June 2, 1970).

72.     Leatherback sea turtles are the largest species of sea turtle and one of the deepest diving vertebrates, diving to depths greater than 3,280 feet. Leatherbacks are unique among sea turtle species in that they primarily consume jellyfish. As a consequence, they are principally found wherever their prey is concentrated.

73.     Unlike the other species of sea turtles, leatherbacks do not have hard scutes made of keratin on their carapace but instead are completely covered by a thin layer of smooth, rubbery, oily skin.

74.     Leatherback sea turtles are present in the Action Area. Leatherbacks often forage in and travel through the Gulf of Mexico, with stopovers in the Mississippi Sound, during the spring and fall. Leatherbacks utilize coastal waters off of Louisiana and Mississippi, including in the Mississippi Sound, primarily for foraging. Additionally, occasional leatherback strandings have been reported on the coastal shores of the Mississippi Sound.

75.     The Corps' and MRC's operation of the Spillway may affect and is likely to adversely affect the leatherback in several ways. For example, pesticide contamination of waterways can lead to respiratory inflammation, gastrointestinal ulceration, organ damage and reproductive failure in leatherbacks. Spillway operations may cause these and other adverse effects.

### e. **Hawksbill Sea Turtle**

76.     Hawksbill sea turtles were listed as endangered under the ESA throughout their range in 1970 due in large part to centuries of overexploitation as the sole source of commercial

tortoiseshell. 35 Fed. Reg. 18,319 (Dec. 1, 1970). Hawksbills are so named for their narrow, pointed beak. This species also has a distinctive pattern of overlapping scales on their shells that form serrated edges.

77.     Hawksbill sea turtles are present in the Action Area. Verified sightings have been recorded in coastal waters of all U.S. Gulf Coast states, including Louisiana and Mississippi. Hatchling and juvenile hawksbill sea turtles have been observed during summer and fall in and around the Mississippi Sound, before prevailing currents carry them into the western Gulf.

78.     The Corps' and MRC's operation of the Spillway may affect and is likely to adversely affect the hawksbill in several ways. For example, as with the other protected sea turtle species, agricultural pesticide and fertilizer pollutants may adversely affect their marine habitat by causing eutrophication and algal blooms, which can kill some of the hawksbill's prey species, such as shrimp and squid. Spillway operations may cause these and other adverse effects.

### f.   Piping Plover and its Designated Critical Habitat

79.     The piping plover was first listed under the ESA in 1985 in large part due to the disturbance and destruction of its habitat. 50 Fed. Reg. 50,726, 50,726 (Dec. 11, 1985). Piping plover in the Bonnet Carré Spillway Action Area are listed as threatened. Id. Named for its melodic mating call, the piping plover is a migratory shorebird that historically ranged throughout North America.

80.     The piping plover is present in the Action Area. The piping plover migrates annually to wintering locations that feature intertidal beaches and mud flats, including the estuary wetland environment surrounding the Bonnet Carré Spillway.

81.     In 2001, FWS designated critical habitat for wintering populations of piping plover along the Mississippi shoreline of the Mississippi Sound. 66 Fed. Reg. 36,038, 36,073–74

(July 10, 2001). In designating the piping plover critical habitat, FWS explained that it "designated only areas within the geographic range [actually] occupied by the piping plover." 66 Fed. Reg. at 36,052; id. at 36,056. In its 2017 Biological Assessment, the Corps stated that critical habitat for the piping plover "has been designated within the [Bonnet Carré Spillway] project area." U.S. Army Corps of Eng'rs New Orleans Dist., Biological Assessment for Bonnet Carré Spillway 2011 and 2016 Emergency Operations at 4 (Nov. 18, 2017) [hereinafter "2017 Biological Assessment"] at 5.

82.     The Corps' and MRC's operation of the Spillway may affect the piping plover in several ways. For example, Spillway operations disrupt typical sedimentation transport regimes and alter sediment deposition in the piping plover's critical habitat. Sediment transportation and deposition are essential to maintaining the integrity of the species' critical habitat. See 66 Fed. Reg. at 36,065; id. at 36,079.

83.     Operation of the Spillway also may impact the piping plover's prey species. Operation of the Spillway may temporarily flood intertidal coastal sand and mud flats where the plovers forage for prey. In addition, pollution and algal blooms cause severe impacts on the health and survival of marine worms, crustaceans, and mollusks, three of the piping plover's prey species. 66 Fed. Reg. 36,038. Disruptions to its prey species may prevent the piping plover from replenishing the fat reserves it needs to complete long-range migrations and maintaining adequate body temperatures in cooler winter conditions. Spillway operations may cause other effects as well.

### g.  Red Knot

84.     The red knot was listed as threatened under the ESA in 2014. 79 Fed. Reg. 73,706.

85.     The red knot is a small shorebird known for making one of the longest-distance migrations on Earth, with some individuals flying more than 9,300 miles between their breeding grounds in the Canadian arctic to their wintering locations in the southeastern United States, northeastern Mexico, northern Brazil, and Tierra del Fuego at the southern tip of South America. 79 Fed. Reg. 73,706, 73,706 (Dec. 11, 2014).

86.     Red knot populations were decimated in the 1800s by commercial hunting for sport and food. More recently the species has suffered from threats to its habitat and prey species. Id.

87.     The red knot is present in the Action Area. Like the piping plover, the red knot has wintering habitat within the Action Area.

88.     Its prey species include invertebrates, such as small clams, mussels, and snails, as well as crustaceans, marine worms, and horseshoe crab eggs. The Corps and MRC's operation of the Spillway may affect and is likely to adversely affect the red knot in several ways. For example, decreased salinity and increased turbidity may affect the red knots prey species. See 2017 Biological Assessment at 3.

89.     The disruption of typical sediment transport and deposition in the red knot's habitat may also impact the integrity of its habitat. Operation of the Spillway causes flooding that may impact the red knot's ability to find their prey species and introduces pollutants that harm the health of or kill their prey species. In addition, spillway operations may cause other adverse effects.

### h.  West Indian Manatee

90.     The West Indian manatee first received federal protection in 1967 and was recently reclassified from endangered to threatened in 2017. 82 Fed. Reg. 16,668, 16,668 (April

24

5, 2017).[2] The West Indian manatee is a marine mammal and herbivore that grazes on aquatic plants and lives in warm water habitat. Although their populations are slowly increasing—in large part due to federal and state conservation efforts—the West Indian manatee continues to face many threats, including watercraft collisions, water control structures, marine debris and entanglement, human harassment, pollution, red tide and other algal blooms, loss of seagrass, habitat degradation, and loss of warm water habitat. Id. at 16,671.

91.     The West Indian manatee is present in the Action Area. In the United States, the West Indian manatee ranges in and along the coasts of the southeastern states and territories, including Louisiana and Mississippi.

92.     During the summer months, migrating manatees can be found in Lake Borgne and Lake Pontchartrain.

93.     FWS has previously notified the Corps that West Indian manatees are known to enter Lake Pontchartrain and associated coastal waters and streams during the summer months of June through September.

94.     The Corps and MRC's operation of the Spillway may affect and is likely to adversely affect the West Indian manatee. The West Indian manatee has a low tolerance for cold water due to the species' low metabolism and minimal fat protection. The species relies on warm water locations, such as the Lake Borgne and Lake Pontchartrain estuaries, during annual

---

[2] The Florida manatee, a subspecies of the West Indian manatee, was listed as endangered in 1967, 32 Fed. Reg. 4,001 (Mar. 11, 1967), under the Endangered Species Preservation Act of 1966. Pub. L. 89–669; 80 Stat. 926. After adoption of the Endangered Species Conservation Act of 1969, Pub. L. 91–135; 83 Stat. 275, the listing was amended to include the West Indian manatee throughout its range in 1970. 35 Fed. Reg. 18,319 (Dec. 2, 1970). The species was grandfathered into the list of endangered and threatened wildlife under the Endangered Species Act of 1973. 16 U.S.C. § 1531 et seq. As part of its federal protections, FWS designated critical habitat for the West Indian Manatee throughout its range in 1976. 41 Fed. Reg. 41,914 (Sept. 24, 1976).

migrations. Changes to the water temperature from the Bonnet Carré Spillway's diversion of cold water into the nearby estuaries may affect manatees.

95.     In addition to the effect on water temperature, severe algal blooms destroy the manatee's sea grass habitat. West Indian manatees both live in and graze on sea grass, and degradation of these sea grass habitat from algal blooms may negatively impact the species foraging and feeding.   Spillway operations may cause these and other adverse effects.

### i.   Gulf Sturgeon and its Designated Critical Habitat

96.     The Gulf sturgeon was listed as threatened under the ESA in 1991. 56 Fed. Reg. 49,653 (Sept. 30, 1991).

97.     The Gulf sturgeon is often referred to as a "living dinosaur." This enormous fish evolved from a species that has existed for more than 200 million years. Despite its longevity, Gulf sturgeon stocks have been greatly reduced or extirpated by overfishing, dam construction, and habitat degradation. 56 Fed. Reg. at 49,653–54.

98.     Gulf sturgeon are present in the Action Area. Gulf sturgeon live in coastal rivers from Louisiana to Florida during the warmer months and spend the colder months in estuaries, bays, and the Mississippi Sound. See 68 Fed. Reg. 13,370, 13370 (Mar. 19, 2003).

99.     Gulf sturgeon critical habitat has been designated in the Bonnet Carré Spillway drainage basin, including parts of the Mississippi Sound, Lake Pontchartrain, and Lake Borgne. Id. All of the designated habitat is considered occupied by the expert wildlife agencies. 68 Fed. Reg. at 13,403.

100.     Floodwater from the Spillway may affect and is likely to adversely affect the Gulf sturgeon and its habitat in several ways. For example, deadly algal blooms and low salinity levels adversely affect the Gulf sturgeon. Fast-moving Spillway discharges may also sweep

young-of-year Gulf sturgeon into the Mississippi Sound, where they are unable to tolerate the higher salinity levels. See 2017 Biological Assessment at 4. In addition, Spillway operations may cause other adverse effects.

**D. The Corps' and MRC's Prior Failures to Operate the Spillway in Compliance with the ESA**

101.    The Corps and MRC have never completed an ESA section 7(a)(2) consultation regarding the effects of Spillway operations on the five sea turtle species, piping plover, red knot, West Indian manatee, Gulf sturgeon, or the critical habitat for loggerhead sea turtles, piping plover or Gulf sturgeon. The Corps and MRC failed to complete consultation despite substantial scientific evidence establishing that operation of the Spillway may affect these listed species and critical habitat in myriad ways.

102.    Instead, the Corps and MRC have concluded that some individual Spillway openings would have "no effect" on these species. These findings are unsupported by any stated rationale and contrary to available evidence. For other openings, the Corps and MRC have ignored these species altogether.

103.    Moreover, to the extent the agencies issued "no effect" findings, they did so only after the Spillway had been opened and closed and the damage was done. To ensure that the individual openings, along with water that seeps into the floodway year-round during the closures, do not jeopardize species or destroy or adversely modify critical habitat, the Corps and MRC must complete the ESA-mandated consultation process on the operation of the Spillway prior to future openings.

**a. The 2011 and 2016 Spillway Openings**

104.    On November 18, 2017—more than six years after the 2011 Spillway opening— the Corps submitted a Biological Assessment to the FWS and NMFS to initiate formal

consultation on the impacts of the 2011 and 2016 openings for the pallid sturgeon and shovelnose sturgeon. 2017 Biological Assessment at 3. The Corps justified the after-the-fact Biological Assessment by characterizing the Spillway openings as an "emergency response action" and relying on the emergency regulations at 50 C.F.R. § 402.05. 2017 Biological Assessment at 29. The Corps did not provide any justification for its lengthy delay.

105.     The Corps acknowledged that there were eleven ESA-protected species in the "project area." Id. at 3. Nonetheless, the Biological Assessment only assessed the impacts of the 2011 and 2016 Spillway openings on pallid and shovelnose sturgeon. Id. at 21–31. For the remaining listed species and critical habitat, the Corps concluded that the two openings had "no effect." Id. at 3–5.

106.     For the five sea turtle species, the rationale for the Corps' "no effect" conclusion is not specified. Id. at 3–4. This conclusion is inconsistent with available scientific evidence. Each of the five species "may be present" in the Action Area. Each of the five species may be affected by Spillway operations. And each of the five species are affected by pollution, cold temperatures, decreased salinity, and other effects associated with Spillway operations. The Corps failed to address the loggerhead critical habitat in the area.

107.     For Gulf sturgeon, the Corps determined that the 2011 and 2016 openings had "no effect" on the species because the "freshwater and sediment inflow" caused by the openings "mimics historical flood events." 2017 Biological Assessment at 4. The Corps provided no further explanation or support for this statement and failed to explain why creation of an artificial flood event that may resemble natural flooding has no effect on Gulf sturgeon. In addition, this finding ignores other potential impacts to the Gulf sturgeon from Spillway operations.

108.     The Corps concluded that the openings would have "no effect" on red knot or

piping plover notwithstanding its contrary finding that that the species' habitat in the Lake

Pontchartrain Basin would be affected at least temporarily. 2017 Biological Assessment at 3.

"Temporary" effects are not excluded from the ESA's consultation requirements. These and

other effects must be evaluated in a consultation.

109.     Regarding Gulf sturgeon and piping plover critical habitat, the Corps concluded

that the Spillway openings resulted in "no impacts." 2017 Biological Assessment at 5. This

conclusory statement is lacking in any scientific support and is otherwise inconsistent with

available scientific evidence. The critical habitat is likely to be affected by decreased salinity,

pollution, and other impacts associated with Spillway operations.

110.     Finally, the Corps also made a "no effect" finding for the West Indian manatee.

Id. at 3. This conclusion is inconsistent with the available scientific evidence. The manatee "may

be present" in the Action Area at least during the summer months. The manatee is also affected

by pollution, cold temperatures, and other impacts associated with Spillway operations.

111.     In response to the Corps' 2017 Biological Assessment, FWS issued a Biological

Opinion in June of 2018. Without any analysis or scientific support, the Biological Opinion

rubber-stamped the Corps' "no effect" determinations. U.S. Fish & Wildlife Serv., Biological

Opinion for the Bonnet Carré Spillway 2011 and 2016 Emergency Operations at v (June 18,

2018). The ESA consultation regulations do not recognize such rubber-stamping of an agency's

"no effect" finding as a section 7 consultation.

### b.  The 2018 and 2019 Spillway Openings

112.     For the three Spillway openings in 2018 and 2019, the Corps failed to complete a

section 7 consultation regarding the potential effects of the openings on the five sea turtle

species, Gulf sturgeon, West Indian manatee, piping plover, red knot, or critical habitat for the

loggerhead sea turtle, Gulf sturgeon, and piping plover. Instead, the Corps initiated consultation on the pallid sturgeon and shovelnose sturgeon only. In doing so, the Corps again invoked the emergency consultation regulations.

113.   For the West Indian manatee, the Corps made a "no effect" finding for each of the three openings. These findings were based on the Corps' assertion that the manatee "should not be in the action area" until the summer months. At a minimum, this finding is inconsistent with the fact that the Spillway was opened from May through July in 2019. In addition, the manatee is also affected by pollution, cold temperatures, and other impacts associated with Spillway operations.

114.   With regard to Gulf sturgeon, FWS responded to the Corps by stating that the species is found in the areas that could be affected by each of the three Spillway openings. FWS also directed the Corps to contact NMFS for information on the species and its critical habitat.

115.   The Corps did not make a "no effect" finding for the five sea turtle species, Gulf sturgeon, piping plover, or red knot in correspondence with FWS or NMFS for any of the three openings in 2018 and 2019. The Corps did not complete consultation with FWS or NMFS regarding the effects of the three openings in 2018 and 2019 on these eight species.

### c.   The 2020 Spillway Opening

116.   To the Plaintiffs' knowledge, prior to opening the Spillway in April 2020, the Corps failed to complete an ESA section 7 consultation regarding the effects of operating the Spillway on the five sea turtle species, Gulf sturgeon, West Indian manatee, piping plover, red knot, or critical habitat for the loggerhead sea turtle, Gulf sturgeon, or piping plover.

## CLAIM FOR RELIEF

**(The Corps and MRC Are in Violation of the ESA for Failing to Ensure, In Consultation with the Services, that Operation of the Spillway Is Not Likely to Jeopardize Listed Species or Adversely Modify Critical Habitat.)**

117.    Plaintiffs hereby reallege and incorporate each and every allegation set forth in this Complaint as if set out in full below.

118.    Section 7(a)(2) of the ESA prohibits federal agencies from taking any action that is "likely to jeopardize the continued existence" of any listed species "or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

119.    To fulfill this substantive mandate, ESA section 7(a)(2) requires federal agencies to consult with the appropriate wildlife on any discretionary "agency action" that "may affect" a listed species or critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.03, 402.14(a).

120.    Available scientific evidence establishes that the operation of the Bonnet Carré Spillway is a discretionary "agency action" that "may affect" numerous threatened and endangered species and critical habitat in several ways.

121.    By failing to complete section 7(a)(2) consultation regarding these effects the Corps and MRC have violated their procedural and substantive obligations under section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2) and otherwise have acted in a manner that is arbitrary and capricious and not in accordance with law. 5 U.S.C. § 706(1), (2)(A).

122.    To the extent the agencies issued "no effect" determinations for individual openings, these determinations are unsupported by and contrary to available evidence, arbitrary and capricious, and otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## RELIEF REQUESTED

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following

relief:

1.   Declare that the Corps and MRC are in violation of ESA section 7(a)(2), 16

U.S.C. § 1536(a)(2), through their operation of the Spillway;

2.   Order the Corps and MRC to complete formal consultation with FWS and NMFS

regarding all effects to listed species and critical habitat resulting from operation

of the Bonnet Carré Spillway;

3.   Award the Plaintiffs their reasonable costs, and expenses, including attorney fees,

associated with this litigation; and

4.   Award the Plaintiffs any other further and additional relief as this Court may

deem just and proper.


Respectfully submitted this 15th day of April 2020,

_/s/ Cynthia Sarthou_
Cynthia Sarthou (MS Bar No. 6469)
Healthy Gulf
P.O. Box 2245
New Orleans, LA 70176
(504) 525-1528
cyn@healthygulf.org

Margaret Coulter (CO Bar No. 54489)          Michael Senatore (DC Bar No. 453116)
McCrystie Adams (CO Bar No. 34121)          Defenders of Wildlife
Defenders of Wildlife                                      1130 17th Street, NW
600 17th Street, Suite 450 N.                           Washington, DC 20036
Denver, CO 80202                                          (202) 682-9400
(303) 825-0918                                              msenatore@defenders.org
mcoulter@defenders.org
madams@defenders.org

_Pending approval of Motions for Admission Pro Hac Vice_

_Attorneys for Plaintiffs Defenders of Wildlife and Healthy Gulf_